IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

REGINALD BELL, pro se,            )
                                  )
        Plaintiff,                )
                                  )
vs.                               )    CIVIL ACTION NO. 15-0148-CG-C
                                  )
WESTROCK SERVICES, INC.,          )
                                  )
        Defendant.                )
                                  )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's motion for summary judgment (Doc. 33), Plaintiff's opposition thereto (Doc. 38), and Defendant's reply (Doc. 39). For the reasons explained below, the Court finds that Defendant's motion is due to be granted.

## FACTS

This case arises from Plaintiff's employment at and termination from Defendant's Mill in Demopolis, Alabama. Plaintiff, a black male, has worked in various areas of the Mill since 1992, but worked in the wood yard for about the last 10 years, until he was fired in September, 2013. (Doc. 33-1, pp. 17-21; Doc. 33-2, ¶ 12 & p. 5). Plaintiff was diagnosed with Post Traumatic Stress Disorder ("PTSD") in 2006. (Doc. 33-1, pp. 38-39). At the time he worked for Defendant, Plaintiff was 6 feet, 2 inches tall and weighed 346 pounds. (Doc. 33-1, pp. 63-64). Plaintiff believed other employees saw him as a monster. (Doc. 33-1, p. 56). Plaintiff thinks most saw him as a monster because he was considered dangerous because of his size and

because he would always blow up if he had a disagreement with someone. (Doc. 33-1, pp. 163-164).

During the last five to six years of Plaintiff's employment, his direct supervisors were Thomas Harris, an African-American male, and Billy Dortch, a Caucasian male. (Doc. 33-1, p. 50; Doc. 33-2, ¶¶4, 5). Tim Myers, a Caucasian male, was superintendent of the Pulp Mill, a level above Billy Dortch. (Doc. 33-1, pp. 51, 58-59; Doc. 33-3, ¶¶ 2). Plaintiff reports that Myers always treated him fairly, honestly, and with respect during his employment. (Doc. 33-1, p. 60). Jim Grantham, a Caucasian male who served as Defendant's General Manager, also treated Plaintiff "somewhat" fairly and honestly. (Doc. 33-1, pp. 61-62; Doc. 33-4, ¶¶ 2, 3). Plaintiff thinks the Human Resources Manager, Chuck Smith, who is a Caucasian male, did not like him because Smith perceived Plaintiff as aggressive and because of his size. (Doc. 33-1, pp. 62-63). Plaintiff felt Chuck Smith did not like him because of jealousy – you can look up what an employee in a particular department makes and "basically, you know, we as a group don't supposed to have anything, so to speak, black people don't supposed to get jack, you know." (Doc. 33-1, p. 140). Plaintiff says someone else told him Chuck Smith used the "N" word, but Plaintiff never heard Smith say it. (Doc. 33-1, pp. 68-69, 141). Plaintiff believes Smith implemented racist hiring practices and thinks some of the people Plaintiff referred were not hired, but he could not identify any specific African-Americans that were better qualified for a position and were not hired. (Doc. 33-1, pp. 141-144). Other than Chuck Smith, Plaintiff does not have any reason to think that any of the

other managers acted negatively toward Plaintiff because of his race. (Doc. 33-1, p.
69).  Plaintiff admits that he never heard any manager use the "N" word or say any
other racially derogatory statement and also that he never heard any of them say
anything negative about his PTSD. (Doc. 33-1, pp. 73-75, 181).  He is also not aware
of any non-disabled employee that under similar circumstances was treated more
favorably than Plaintiff was. (Doc. 33-1, p. 189).

Plaintiff has a history of behaving in a threatening or abusive manner at the
Mill.  In 1995 Plaintiff received a five day suspension for threatening and abusive
behavior after engaging in a "word fight" with another employee who "broke wind"
in his presence.  Plaintiff told the employee that he would meet him elsewhere to
fight. (Doc. 33-1, pp. 75-79).  Plaintiff received a five-day suspension in 2000 for
using threatening and abusive language in a phone call to his girlfriend's sister,
who was employed by Defendant as a guard.  The phone call was overheard by the
sister's supervisor, which led to Plaintiff's discipline. (Doc. 33-1, pp. 79-82).  On
November 24, 2008, Plaintiff received a written reprimand and one day suspension
for "being insubordinate or willfully disobeying or refusing to carry out proper
orders given in the line of duty." (Doc. 33-1, pp. 223-224, 387). On September 3,
2009, Plaintiff received a written reprimand and three-day suspension for
"[e]ngaging in inappropriate behavior toward another employee" and "engaging in
intimidation and using abusive and threatening language."  For the September
2009 discipline, Plaintiff claims he was set up by Drew Cargile and claims that
Cargile told Garry Hopkins that Cargile was "just trying to make me mad and get

me in trouble."  Plaintiff did not tell Chuck Smith about being set up. (Doc. 33-1, pp. 224-228).  After the incident with Drew Cargile, Plaintiff talked to Garry Hopkins and told him he had PTSD. (Doc. 33-1, p. 190).  Plaintiff thinks he told Billy Dortch about his PTSD also. (Doc. 33-1, p. 190).

Following the September 2009 suspension, Plaintiff met with Carl Wright, a Caucasian male who was the General Manager at the time, for a "heart to heart talk." (Doc. 33-1, p. 94).  According to Plaintiff, Wright laid out all the incidents and pointed out that everyone Plaintiff interacted with, "I get into it with." (Doc. 33-1, p. 94).  Plaintiff promised to seek help for anger issues. (Doc. 33-1, p. 96).

On September 24, 2012, Plaintiff received a written reprimand and ten day suspension for "[e]ngaging in inappropriate behavior toward another employee" including "engaging in intimidation and using abusive and threatening language." (Doc. 33-1, pp. 229, 396).  The incident involved a confrontation with an African-American male coworker, Elbert Jackson. (Doc. 33-1, pp. 98-101, Doc. 33-2, ¶ 9). Plaintiff disputes certain details regarding the incident and claims that Harris, his supervisor at the time, lied to Chuck Smith by saying that he had to get between Plaintiff and Jackson. (Doc. 33-1, p. 61).  Following the incident Plaintiff entered into a "Last Chance Agreement" which stated: "I understand that this serious step was taken because unless I change my behavior or performance, my employment with RockTenn Company will be terminated. … I agree that my signature on this document means this is my last chance." (Doc. 33-1, pp. 229-230, 397).  The Company paid for Plaintiff to attend anger management classes at Psychology

Associates in Meridian, Mississippi. (Doc. 33-1, p. 113-115).  Plaintiff requested to be moved away from Elbert Jackson's shift, but then Plaintiff worked out his problems with Jackson and agreed to keep working on the same shift. (Doc. 33-1, pp. 105-106).

On July 1, 2013, Plaintiff again requested to be moved off Jackson's shift. (Doc. 33-1, p. 109; Doc. 33-3, ¶ 4).  Superintendent Tim Myers located another employee who was willing to swap shifts with Plaintiff, but before the swap was made, the employee changed his mind. (Doc. 33-1, pp. 109-111; Doc. 33-3, § 5). When Myers told Plaintiff the swap was not going to work, Plaintiff said he no longer needed to be removed from Jackson's shift because they had worked their problems out. (Doc. 33-1, p. 111, Doc. 33-3, ¶ 5).

In September 2013, Plaintiff got in an argument with coworker Nick Ladrun, a Caucasian male, over moving rail cars in the plant.  Plaintiff pushed Ladrun in the chest and told him that he needed to "hook [him] up to the f'ing car." (Doc. 33-1, pp. 117-122; Doc. 33-2, ¶ 10).  On September 19, 2013, Plaintiff was terminated. (Doc. 33-1, pp. 118, 235, 408).  Defendant's General Manager, David Grantham, who made the decision to terminate Plaintiff determined that the incident with Ladrun violated the Last Chance Agreement and required automatic termination. (Doc. 33-4, ¶ 5).  Grantham also determined that Plaintiff's employment should be terminated because of his continued aggressive behavior, the danger he presented to others, and Grantham's lack of confidence in any future improvement in his behavior. (Doc. 33-4, ¶ 5).  Plaintiff does not dispute that he violated his Last

Chance Agreement and that his violation was the reason for his termination. (Doc. 33-1, pp. 132-133).

After he was terminated, Plaintiff brought a grievance through the Union. (Doc. 33-1, p. 126). As part of the grievance process, Defendant agreed that they would consider re-hiring Plaintiff if he attended additional anger management training. (Doc. 33-1, pp. 127-128). Plaintiff enrolled in and completed a 45-day in-house PTSD program through the VA hospital. (Doc. 33-1, pp. 128-129). During that time, the Company received multiple complaints on their Company Hotline voicing concerns for their safety if Plaintiff returned to work. (Doc. 33-4, ¶ 8 & pp. 5-8). Grantham decided not to reinstate Plaintiff's employment. (Doc. 33-4, ¶ 9). On January 24, 2014, Plaintiff filed an EEOC charge against Defendant alleging discrimination on the basis of his race and on the basis of his disability. (Doc. 33-2, ¶ 13 & pp. 5-6).

Plaintiff believes the reason he was not re-hired was because of the employee complaints to the Hotline. (Doc. 33-1, pp. 192, 238). Plaintiff also stated that he believes that Defendant's failure to reinstate him was related to his race and disability because he heard that the Human Resources Manager, Chuck Smith, had said "he's the one that will come out there and shoot 'em up, like go postal, you know." (Doc. 33-1, p. 191). Plaintiff believes that his race played a part in his termination "because of my position that I held and because of my track record."

Plaintiff says another employee, Dwight Mosely, who is white got fired after violating a Last Chance Agreement when he was caught looking at porn on the

computer, but he was hired back. (Doc. 33-1, pp. 156-157).  Plaintiff does not know the details of Moseley's circumstances. (Doc. 33-1, p. 158).  Plaintiff also says that another employee, Tim Thornton, remarked one time that he felt "like killing me somebody today" in 2013 and Plaintiff thinks Thornton just had to go to anger management. (Doc. 33-1, pp. 160-161).  Plaintiff does not know if Thornton had any other incidents after that, but Plaintiff says Thornton had a prior incident involving harassment of a female co-worker. (Doc. 33-1, p. 161).

In his response to summary judgment, Plaintiff did not submit any affidavits or other evidence in opposition, but he requests "a fair day in court" and says he has "all the information I need [to] back up the allegations." (Doc. 38, pp. 1, 2).  Plaintiff reports that he feels he was not treated fairly or given a fair chance at getting his job back. (Doc. 38).  He also reports that he "had to deal with Hangman's noose being used to intimidate me and idle threats being made through private calls." (Doc. 38, p. 1).

## DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 249 (1986).  The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." Vega v. Invsco Group, Ltd., 2011 WL 2533755, *2 (11th Cir. 2011).  In reviewing whether a non-moving party has met its burden, the Court must draw all justifiable inferences in favor of the non-moving party. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 – 99 (11th Cir. 1992) (internal citations and quotations omitted).  Thus the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." <u>Liberty Lobby</u>, 477 U.S. at 251–52.

## B.  Plaintiff's Claims

The Court notes that Plaintiff is proceeding *pro se* and this Court will attempt to give his pleadings a very lenient reading.

> Courts do and should show a leniency to *pro se* litigants not enjoyed by those with the benefit of a legal education.  <u>See, e.g.</u>, <u>Powell v. Lennon</u>, 914 F.2d 1459, 1463 (11th Cir.1990).   Yet even in the case of *pro se* litigants this leniency does not give a court license to serve as *de facto* counsel for a party, <u>see</u> <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1109 (10th Cir.1991), or to rewrite an otherwise deficient pleading in order to sustain an action, see <u>Pontier v. City of Clearwater</u>, 881 F.Supp. 1565, 1568 (M.D.Fla.1995).

<u>GJR Investments Inc. v. County of Escambia, Fla.</u>, 132 F.3d 1359, 1369 (11th Cir. 1998).   Plaintiff  "is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure," the same as any other litigant. <u>Moon v. Newsome</u>, 863 F.2d 835, 837 (11th Cir. 1989).

Plaintiff's <u>pro se</u> Complaint states that the acts complained of consist of the termination of his employment and claims under Title VII and the ADA. (Doc. 14, p. 4).  The Complaint states that Defendant's conduct is discriminatory with respect to Plaintiff's race and the ADA. (Doc. 14, p. 5).  Plaintiff's complaint also states that he was discriminated against in the following way:

> Chuck Smith used the "N" word Relation to me, all decision were not in my favor. He didn't accomdate my situation.
> Tim Myers neglegte me and my disability (PTSD) Tomas Harris Lied to Chuck Smith about an incident between myself and another Employee. Union Brother, sister called a hot Line made complaints about myself station They were scared to work with me.

(Doc. 14, p. 5).

Plaintiff filed his EEOC charge on January 24, 2014 alleging discrimination on the basis of his race and on the basis of his disability.  Plaintiff's EEOC complaint alleges the following:

> My race is Black. I am an individual with a disability. I was hired by the above-named employer on July 23, 1992 as a Board Reserve. My immediate supervisor was Billy Dorcth. I was subjected to harassment, a hostile work environment, suspension and discharge as a result of my race and my medical disability. I have been disciplined because of my race in that I am a large Black male and I am not afraid to speak my mind or to have an opinion. I made a request for accommodation to the employer stating that I am a combat veteran and have Post Traumatic Stress Disorder (PTSD) but the employer refused to engage in the interactive process or to provide an accommodation. I was terminated on September 20, 2013.  Around October 4, 2013, I enrolled in a 45-day program with the VA for PTSD and anger management. About December 20, 2013 I was notified by Union Representative Hopkins that he got my job back as a result of my program completion. I later learned around January 6, 2014 that the company lawyer advised that I not be rehired.
>
> I was terminated during a meeting with Human resources Chuck Smith Union Representative Gary Hopkins and several other individuals. The reason provided was that I was on a last chance notice.
>
> I believe that I was discriminated against on the basis of my race in violation of Title VII of the Civil Rights Act of 1964, as amended. I further believe that I was discriminated against on the basis of my disability in violation of the Americans with Disabilities Act of 1990, as amended. A similarly situated Black male, Tyress (last name unknown) was sent to the VA for treatment after participating in a physical altercation and was retained. A White male Time Thornton threatened to kill "somebody out here" and he too was retained without discipline.

(Doc. 33-2, p. 6).

In order to assert a claim under Title VII or the ADA, a claimant must file a complaint with the EEOC within 180 days after the alleged discriminatory practice

occurred. 42 U.S.C. § 2000e-5(e).  This 180-day period "begins to run from the time that the complainant knows or reasonably should know that the challenged act has occurred." <u>Allen v. U.S. Steel Corp.</u>, 665 F.2d 689, 692 (5th Cir. 1982) (citations omitted).  Thus, to the extent Plaintiff is attempting to assert claims based on discreet conduct that occurred prior to July 28, 2013, those claims are time-barred.[1]

Looking at Plaintiff's complaint and EEOC charge together, Plaintiff appears to assert that he was discriminated against on the basis of race, that he was discriminated against because of his disability and that Defendant failed to accommodate his disability.  Plaintiff mentions harassment and a hostile work environment in his EEOC charge but does not mention it in his complaint and does not assert any factual allegations to support such a claim other than to state that Chuck Smith used the "N" word.  As such, the Court finds that Plaintiff has not sufficiently asserted a claim for hostile work environment.[2]

---

[1] Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire start the 180-day clock for discrimination claims. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114 (2002).

[2] The Court notes that the evidence presented also does not support such a claim.  A plaintiff wishing to establish a hostile work environment claim must show: "(1) that he belongs to a protected group;  (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin;  (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1275 (11th Cir. 2002)

The Court finds that Plaintiff has asserted claims of racial discrimination and disability discrimination relating to his termination.  Plaintiff has also asserted a claim for disability discrimination based on Defendant's failure to accommodate his disability.  The Court will discuss these claims below.

### 1. Racial Discrimination

Plaintiff claims his termination or failure to be rehired was motivated, at least in part, by racial discrimination.  Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  A plaintiff may prove discrimination or retaliation by relying on either direct, circumstantial, or statistical evidence.  See Walker v. Nationsbank of Florida N.A., 53 F.3d 1548, 1555 (11th Cir. 1995).  Direct evidence is evidence which, "if believed, proves the existence of discriminatory motive 'without inference or presumption'" Hamilton v. Montgomery County Bd. of Educ., 122 F.Supp.2d 1273, 1279 (M.D. Ala. 2000) (quoting Carter v. Three Springs Residential

---

(citation omitted).  Plaintiff admits that he never heard Smith use the "N" word and that he never heard any of the managers say anything racially derogatory.  There is clearly no evidence indicating that any harassment was sufficiently severe or pervasive to alter the terms and conditions of employment.  In his response to summary judgment, Plaintiff states that he "had to deal with Hangman's noose being used to intimidate me and idle threats being made through private calls" but there is no evidence to support that statement. Even if Plaintiff had shown that he was subjected to harassment by co-workers, there is no evidence that his employer knew about or was responsible for the harassment.  Plaintiff admits that other than Chuck Smith, there was no reason to think that any of the other managers acted negatively toward Plaintiff because of his race.

12

Treatment,132 F.3d 635, 641 (11th Cir. 1998)).  As the U.S. District Court for the

Middle District of Alabama explained:

> Not only must it be evidence of discriminatory 'actions or statements of
> an employer' but the actions or statements at issue must 'correlate to the
> discrimination or retaliation complained of by the employee.' Further, the
> statements 'must be made by a person involved in the challenged
> decision' and must not be subject to varying reasonable interpretations.

Id. (quoting Lane v. Ogden Entertainment, Inc., 13 F.Supp.2d 1261, 1274 (M.D. Ala.

1998)).  No direct evidence of discrimination or retaliation has been submitted to the

Court.  None of the evidence offered proves without inference or presumption that the

person who made the employment decisions did so based on Plaintiff's race.  Plaintiff

has also not attempted to show discrimination through statistical evidence.

A plaintiff may attempt to show discrimination based on circumstantial

evidence through the application of the McDonnell Douglas burden-shifting analysis

established by the Supreme Court. McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973.  Under the McDonnell Douglas framework, a plaintiff must first raise an

inference of discrimination by establishing a prima facie case. See Chapman v. AI

Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing Combs v. Plantation Patterns,

106 F.3d 1519, 1527-28 (11th Cir.1997)).

In order to make out a prima facie case of discrimination, a plaintiff must show:

> (1) []he is a member of a protected class; (2) []he suffered an adverse job
> action; (3) [his] employer treated similarly situated employees outside
> h[is] classification more favorably; and (4) []he was qualified to do the job.

13

Barnes v. Crowne Investments, Inc., 391 F.Supp.2d 1108, 1115 (S.D. Ala. 2005) (citations omitted).  The first prong is satisfied, as it is undisputed that Plaintiff is a member of a protected class.  There is also no dispute that Defendant suffered an adverse job action by being terminated and not rehired.

As to whether similarly situated employees outside his classification were treated more favorably, Plaintiff testified about two white employees.  According to Plaintiff another employee, Dwight Mosely, got fired after violating a Last Chance Agreement when he was caught looking at porn on the computer, but he was hired back.   Plaintiff also testified that another employee, Tim Thornton, had a prior incident involving the harassment of a female co-worker, but when Thornton remarked that he felt "like killing me somebody today" in 2013, he just had to go to anger management.  However, Defendant contends that these employees were not similarly situated.  To be appropriate comparators, the employees must be "similarly situated in all aspects." Holifield v. Reno, 115 F.3d 1555, 1563 (11th Cir. 1997).  "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004) (internal citations omitted).  Plaintiff admits that he does not know the details of Moseley's circumstances and that he does not know if Thornton had any other incidents after attending anger management classes.  There is no indication that either of the employees had an extensive history of misconduct like Plaintiff.  Additionally, Moseley's misconduct was of an entirely different nature

14

and Thornton appears to have been treated the same as Plaintiff.  Plaintiff was also sent to anger management classes after engaging in threatening and abusive behavior.   Accordingly, the Court finds that Plaintiff has failed to provide evidence that Defendant treated similarly situated employees outside h[is] classification more favorably.

"In opposing a motion for summary judgment, a 'party may not rely on his pleadings to avoid judgment against him.'" Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995), cert. denied sub nom., Jones v. Resolution Trust Corp., 516 U.S. 817 (1995)(citing Ryan v. Int'l Union of Operating Eng'rs., Local 675, 794 F.2d 641, 643 (11th Cir. 1986)).  Moreover, " [t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint [or answer] but not relied upon in summary judgment are deemed abandoned." Id. at 599 (citations omitted).

Even if Plaintiff could establish a prima facie case, the Court finds that his discrimination claim would still fail.  If Plaintiff could establish a prima facie case of discrimination, the burden would then shift to the Defendant, who must "proffer a legitimate, non-discriminatory reason for the adverse employment action.  The employer's burden is exceedingly light." Hamilton, 122 F.Supp.2d at 1280 (quoting Meeks v. Computer Assoc. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal quotations omitted)).  If the Defendant proffers a legitimate reason for the

15

employment decisions, the burden then shifts back to plaintiff, who must show that the employer's proffered reasons are pretextual, or merely a cover for discrimination. Id.  "At the pretext stage, in order to survive summary judgment, Plaintiff[s] must provide sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the proffered reasons were not actually the motivation for the employer's decision." Miller v. Bed, Bath & Beyond, Inc., 185 F.Supp.2d 1253, 1270 (N.D. Ala. 2002) (citing Combs, 106 F.3d at 1538).  Plaintiff may do this  "(1) by showing that the employer's legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, a discriminatory reason more likely motivated the decision." Id. (citations omitted).  "This is done by pointing to 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence.'" Hamilton, 122 F. Supp.2d at 1281 (quoting Combs, 106 F.3d at 1539).  The ultimate burden of persuasion remains with the plaintiff at all times in cases involving merely circumstantial evidence. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

     In satisfying the ultimate burden of proving that the adverse employment action was on account of race, a plaintiff need not establish that race was the sole reason for the action, but that it was a determinative factor in the employer's decision. See Anderson v. Savage Laboratories, Inc., 675 F.2d 1221, 1224 (11th Cir. 1982) (citing Haring v. CPC International, Inc., 664 F.2d 1234, 1239-40 (5th Cir. 1981)).

However, it should be noted that federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." <u>Chapman</u>, 229 F.3d at 1030 (quoting <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991)).  It is not appropriate for either the plaintiff or this court to "recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer." <u>Chapman</u>, 229 F.3d at 1030.

In this case, defendant has clearly met its burden of proffering a legitimate, non-discriminatory reason for firing Plaintiff – his repeated aggressive behavior and his violation of his Last Chance Agreement.  Plaintiff admits that he violated his Last Chance Agreement and that his violation was the reason for his termination.  Defendant has also offered a legitimate non-discriminatory reason for not rehiring Plaintiff – his repeated disciplinary incidents and multiple complaints by co-workers that they were afraid for their safety if Plaintiff returned to work.  Plaintiff admits that the reason he was not re-hired was because of the employee complaints to the Hotline.

Plaintiff asserts that he also believes that Defendant's failure to reinstate him was related to his race "because of my position that I held and because of my track record."  It is not clear how Plaintiff's position or "track record" supports his assertion that the decision was related to race.  It is undisputed that Defendant's General Manager, David Grantham, made the decision to fire and not rehire Plaintiff and Plaintiff admits that Grantham treated Plaintiff fairly and honestly.  As such, the

Court finds that Defendant has proffered legitimate non-discriminatory reasons for its decisions and Plaintiff has not shown that the proffered reasons are pretextual

## 2. Disability Discrimination

The Americans with Disability Act ("ADA") 42 U.S.C. § 12112(a) prohibits discrimination "against a qualified individual on the basis of disability…" 42 U.S.C. § 12112(a). The Eleventh Circuit has explained that to establish a prima facie case of disability discrimination under the ADA, a plaintiff must show that (1) he has a disability; (2) he is qualified to perform the job; and (3) he was discriminated against because of his disability. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004) (citing Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002); Gordon v. E.L. Hamm & Assoc., Inc., 100 F.3d 907, 910 (11th Cir. 1996)). As with the racial discrimination claim discussed above, if Plaintiff establishes a prima facie case, a presumption of discrimination arises and the burden shifts to Defendant to proffer a legitimate, non-discriminatory reason for the employment action. Id. If the defendant meets its burden, then Plaintiff must show that the proffered reason is a pretext for discrimination. Id.

Plaintiff claims he is disabled under the ADA because he suffers from PTSD. While PTSD is a mental impairment Courts have found that PTSD, in and of itself, does not necessarily meet the statutory definition of an ADA disability. The EEOC's regulations implementing the ADA define "mental impairment" as "[a]ny mental or

18

psychological disorder, such as intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2); see Hamilton v. Southwestern Bell Tel. Co., 135 F.3d 1047, 1050 (5th Cir. 1998) ("PTSD ... standing alone, is not necessarily a disability contemplated by the ADA."); Miller v. Fed Ex Corp. Office, 2008 WL 3020884, at *11-12 (N.D. Fla. July 30, 2008) (same); Johnston v. Henderson, 144 F.Supp.2d 1341, 1350 (S.D. Fla. 2001), aff'd sub nom. Johnston v. U.S. Postmaster General, 277 F.3d 1380 (11th Cir. 2001) (same).  Such Courts have held that to be covered under the ADA, a plaintiff must demonstrate that his PTSD was such that it substantially limited a major life activity. See 29 C.F.R. § 1630.2(g)(1). Hamilton, 136 F.3d at 1050; Johnston, 144 F.Supp.2d at 1350.  However, Congress has broadened the coverage of the ADA, stating that " 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(i).  In fact the ADA now specifically lists PTSD as a type of impairment "that substantially limit[s] brain function." 29 C.F.R. § 1630.2(j)(3)(iii).  Additionally, the term "Major Life Activities" has been expanded to expressly include "interacting with others," which is precisely what Plaintiff appeared to have difficulty with in the instant case. 29 C.F.R. § 1630.2(i).  Accordingly, the Court finds that Plaintiff is disabled under the ADA.

As to whether Plaintiff was qualified to do the job, the Court finds that there is sufficient evidence to show that Plaintiff was qualified.  Plaintiff has been working at the Mill since 1992 and, other than his problems interacting with others, there has

been no suggestion that Plaintiff was not capable of performing the work.  The Court finds there is clearly sufficient evidence for a jury to find that Plaintiff was sufficiently qualified.

However, the Court finds there is no evidence that Plaintiff's termination or the decision not to rehire Plaintiff was discriminatory.  As discussed above with regard to Plaintiff's racial discrimination claim, Plaintiff admits that the decision maker in this case, David Grantham, treated Plaintiff fairly and honestly.  Plaintiff testified that he believes that Defendant's failure to reinstate him was related to his disability because he heard that the Human Resources Manager, Chuck Smith, had said that "he's the one that will come out there and shoot 'em up, like go postal, you know."  Smith was not the decision maker, but even if Smith played a role in the decisions his reference to Plaintiff's dangerous and explosive nature does not demonstrate that the decisions were motivated by discriminatory animus towards Plaintiff's disability.  Fear for co-workers safety undoubtedly was part of the reason for Defendant's decisions to fire and not to rehire Plaintiff.  Even if the fear that Plaintiff would "shoot 'em up" is related to Plaintiff's disability "the ADA does not immunize disabled employees from discipline or discharge for incidents of misconduct in the workplace." Krasner v. City of New York, 2013 WL 5338558, at *12 (S.D.N.Y. Sept. 23, 2013), aff'd, 580 F. App'x 1 (2d Cir. 2014); see also Dewitt v. Sw. Bell Tel. Co., 41 F. Supp. 3d 1012, 1021 (D. Kan. 2014) (citations omitted) ("a 'second chance' or overlooking misconduct that otherwise warrants termination is not a "reasonable accommodation."); Willis v. Norristown

20

Area Sch. Dist., 2 F. Supp. 3d 597, 605 (E.D. Pa. 2014) (citation omitted) ("[The ADA]

does not prevent an employer from discharging an employee for misconduct, even if

that misconduct is related to a disability.").  As the Middle District of Florida has

explained:

> "the law is well settled that the ADA is not violated when an employer
> discharges an individual based upon the employee's misconduct, even if
> the misconduct is related to a disability." Ray v. Kroger Co., 264
> F.Supp.2d 1221, 1228 (S.D.Ga.2003). See also Jones v. Am. Postal
> Workers Union, 192 F.3d 417, 429 (4th Cir.1999) (employer not liable
> under the ADA for terminating schizophrenic employee after that
> employee threatened a coworker); Hamilton v. S.W. Bell Tel. & Co., 136
> F.3d 1047, 1052 (5th Cir.1998) ("An employee who is fired because of
> outbursts at work directed at fellow employees has no ADA claim.").
> Tellingly, the EEOC's "Primer on the ADA" as quoted in the Foley case
> states that employers "do not have to excuse violations of conduct rules
> necessary for the operation of your business. Example: You do not have to
> tolerate violence, threats of violence, theft or destruction of property,
> even if the employee claims that a disability caused the misconduct."
> Foley [v. Morgan Stanley Smith Barney, LLC, 2013 WL 795108 *8 (S.D.
> Fla. Mar. 4, 2013)].

Oliver v. TECO Energy, Inc., 2013 WL 6836421, at *9 (M.D. Fla. Dec. 26, 2013).  This

Court agrees with the rationale of the above cases.  There is no evidence that Plaintiff

was fired or not rehired because of his PTSD.  Plaintiff was fired because he

repeatedly exhibited unacceptable and dangerous behavior.  The fact that the behavior

may have been precipitated by Plaintiff's PTSD does not present an issue under the

ADA.

Another way an employer unlawfully discriminates against a qualified

individual with a disability is when the employer fails to provide "reasonable

accommodations" for the disability—unless doing so would impose undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A).  "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows her to perform the job's essential functions." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255-56 (11th Cir. 2001) (citation omitted). "[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir.1999).

In the instant case, the only evidence of requests for accommodations is Plaintiff's requests to be moved away from Elbert Jackson's shift.  Plaintiff requested to be put on a different shift twice, first in 2012 and again in 2013, but after each request Plaintiff admits that he worked out his problems with Jackson and agreed to keep working on the same shift.  Defendant asserts that claims based on these requests are time barred.  However, even if are not time barred, Defendant made efforts to accommodate Plaintiff and Plaintiff admits he withdrew the requests. Defendant attempted to find an employee to switch with Plaintiff and only gave up its search when Plaintiff said he had worked out his problem with Jackson and did not need to switch.  Defendant's inability to immediately move Plaintiff when he made the requests cannot be considered a violation of the ADA. See Terrell v. USAir, 132 F.3d 621, 626 (11th Cir. 1998) ("In this case, where USAir had no part-time jobs when Plaintiff demanded such a position, a request for part-time employment was

22

unreasonable."); <u>Diaz v. Transatlantic Bank</u>, 367 Fed. Appx. 93, 98 (11th Cir. 2010) (citing <u>Terrell</u> <u>supra</u> ) ("An employer is not required to reasonably accommodate an employee by creating a new position.").  Accordingly, the Court finds that Plaintiff has failed to support his claims for discrimination based on his disability.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (Doc. 33) is **GRANTED**.

**DONE** and **ORDERED** this 17th day of June, 2016.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE